**Affirmed as Modified and Opinion Filed June 9, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-01398-CR
## No. 05-12-01687-CR

**DARIUS EDWARDS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause Nos. F10-71377-X & F10-51415-X**

## OPINION

Before Justices Fillmore, Evans, and Lewis
Opinion by Justice Fillmore

After Darius Edwards waived his right to trial by jury, the trial court found him guilty of one offense of aggravated sexual assault of a child and one offense of sexual assault of a child. Edwards pleaded true to the alleged enhancement paragraph in both indictments. The trial court found each alleged enhancement paragraph to be true and assessed punishment in each case of fifteen years' imprisonment. In three issues, Edwards contends the evidence is insufficient to support the convictions and the trial court erred by admitting hearsay evidence. As modified, we affirm the trial court's judgments.

### Background

Ira Brown, B.A.'s grandmother and guardian, testified that B.A.'s mother died when B.A. was two years old and B.A.'s father died when B.A. was five or six years old. Other important

people in B.A.'s life, including Brown's aunt, mother, and brother, have also died. When B.A. was thirteen, she expressed the desire to have a baby. Brown thought that B.A. believed a baby would be someone "that she'd always have" to love and to love her. Because of B.A.'s fixation on having a baby, Brown began taking her to a therapist. Brown also placed B.A. in a program called Girls, Inc. so that B.A. would have something to do in the summertime.

B.A. testified that she was born on November 15, 1995. When she was thirteen years old, she was involved in Girls, Inc., an "empowerment" program for girls. Although B.A. could not recall whether it was in 2008 or 2009, she recalled Girls, Inc. taking her and a group of other girls to the Town East Mall on an outing at the beginning of the school year. On the outing, B.A. met Edwards, who was at the mall with his nephews to pay his phone bill. According to B.A., Edwards told her to call him. Because B.A. did not have a personal telephone, and did not want to give Edwards her home phone number for fear that Brown would answer the phone, she saved Edwards's phone number in a friend's cellphone.

B.A. called Edwards that night. Edwards told B.A. that he was twenty-three or twenty-four years old, and B.A. told Edwards that she was sixteen years old. B.A. and Edwards had a number of conversations over the following days. At Edwards's request, B.A. also sent him pictures of herself. In some of the pictures, B.A. was naked. During their conversations, Edwards told B.A. he was going to give her his baby and that they were going to be together.

In September or October, B.A. and Edwards agreed to meet. B.A. told Edwards that she attended St. Anthony's school in South Dallas. According to B.A., St. Anthony's included kindergarten through the eighth grades. Edwards's nephew and daughter attended the same school. B.A. told Edwards that, after her uncle took her to school, she would pretend she was going into the school. Once her uncle left, she would meet Edwards at the side of the school. The next day, Edwards was waiting for B.A. by the school in a white Expedition. According to

B.A., she was wearing her school uniform of a plaid skirt and a white shirt with "St. Anthony's" on it. In B.A.'s mind, Edwards was picking her up to have sex and to give her his baby.

B.A. initially testified this incident occurred in November and that she did not think anybody else was in the car. However, after refreshing her memory by reading a written statement she had previously given, B.A. testified Edwards picked her up the first time in October and that Edwards's son was in the car with him. B.A. stated she had confused incidents that occurred in October and November. She could not recall the day in October that Edwards picked her up from school.

B.A. testified that, in October 2009, she and Edwards took his son to day care and then went to the Star Motel. Edwards rented a room while B.A. stayed in the car. Once they were in the motel room, Edwards told B.A. to relax and turned on a pornographic movie. Edwards then asked B.A. if she could do what the woman in the movie was doing. B.A. admitted she did not include in her written statement that she and Edwards watched a pornographic movie. B.A. had vaginal sex with Edwards at the Star Motel. According to B.A., Edwards used a condom and she was angry because Edwards lied to her about giving her his baby.

B.A. turned fourteen on November 15, 2009. Edwards told her that he had a birthday present for her. According to B.A., on November 23, 2009, Edwards picked her up at school and took her to his business, I Print 2. B.A. was certain of the date because it was a friend's birthday. Edwards gave B.A. a tour of the building. There were pictures of naked girls and girls in bikinis and in costumes on the walls. Edwards told her they were pictures of his customers. B.A. testified that she and Edwards had vaginal sex upstairs on a sofa. Edwards bought B.A. some orange juice and a donut before taking her back to school.

B.A. testified that the third time Edwards picked her up from school "the whole fiasco went down." B.A. believed this was "around January." Edwards took B.A. to I Print 2. She and

Edwards were having vaginal sex when another man came into the room and asked if Edwards would share. Edwards told her to have sex with the other man. As B.A. was having vaginal sex with the man, a third man walked into the room and handed Edwards something. The third man then had anal sex with B.A.

B.A. decided she did not want to see Edwards anymore. However, six or seven weeks later, she was sick and did not go to school. She called Edwards. Edwards asked if he could come over, but B.A. said no. B.A. still wanted to have Edwards's baby, so she called him again the next day. Edwards came to her house and they had sex. B.A. was upset because Edwards again wore a condom, but she thought she eventually was "going to get his child." She asked Edwards why he would not give her his child, and he said that she was not ready for a child. B.A. became angry and told Edwards to leave. After that, Edwards stopped answering B.A.'s phone calls, and she felt as if she had been used.

B.A. started having "flashbacks" about the incident with the two other men and could not sleep. She also began worrying that Edwards knew where she lived. B.A. was afraid that Edwards was going to come get her because, at some point, she had told him that she was fourteen and had talked to him about the fact she attended the same school as his daughter and his nephew. Approximately four weeks after Edwards came to B.A.'s house, Coach Polk noticed that something was upsetting B.A. and called her into the office. Polk asked her what was wrong. B.A. made Polk promise not to tell anybody and then told Polk about Edwards and the two men. She told Polk that she had not told anybody about the incidents because she did not want to get Edwards into trouble and because she did not want to get into trouble for agreeing to have sex with him. Polk told B.A. that she was going to have to report what B.A. had told her.

B.A. gave the police a written statement. At trial, B.A. admitted that some facts in the statement were incorrect and that the statement was not complete. She believed she did not

–4–

include the last time she had sex with Edwards in the statement because she was tired. After speaking to the police, B.A. called Edwards to apologize.

B.A. admitted she had a history of mental health problems, including bipolar disorder, depression, and anxiety, and had been on medication for those problems at different times in her life. B.A. first took medication for her mental health issues when she was twelve years old. B.A. also admitted she had received treatment in several mental health facilities and had been discharged from two of those facilities for inappropriate behavior. B.A. initially testified that she lied when she told her doctors she began smoking marijuana when she was twelve years old and that she did not start smoking marijuana until she was thirteen years old. However, she also testified that she first smoked marijuana at age twelve, but did not smoke it on a regular basis. B.A. admitted she had also used PCP, ecstasy, Xanax, and alcohol. B.A. stated she had used a lot of drugs and her drug use had affected her memory. B.A. testified she no longer used drugs and no longer smoked marijuana regularly. She admitted, however, that she had smoked marijuana three days before the trial and that smoking marijuana violated a condition of her probation. B.A. was on probation for theft and possession of an "illegal weapon."

Jennifer Polk testified that, in January 2010, she was a "PE" and first grade aide and a volleyball, basketball, and track coach at St. Anthony's. Classes at St. Anthony's began at 7:45 a.m. and ended at 3:30 p.m. In 2009, the school was closed during the week of Thanksgiving.

On January 20, 2010, several students told Polk that B.A. was crying in the locker room. After receiving permission from the principal to talk to B.A., Polk took B.A. to the registrar's office and asked her what was wrong. B.A. made Polk promise that she would not say anything if B.A. told her. B.A. then told Polk that "D" picked her up earlier that day and took her to his workplace where they had sex. B.A. said she and "D" had done that before and, on one occasion, "D" allowed two other men to have sex with her. Polk did not know when the incident

–5–

with the two men occurred. B.A. told Polk that "D" was older and they had been "talking" for "a while." B.A. explained that "D" picking her up was the reason she had missed school and been tardy. B.A. did not say how many times she had sex with "D," but indicated it was more than one time and stated it had occurred at a motel and at "D's" workplace. Polk told B.A. that she had to report what B.A. had told her. After that, B.A. did not trust Polk and they had no further contact.

Detective Jerry Williams was assigned to investigate the case. Williams interviewed B.A. and she gave him a written statement. B.A. told Williams that she had sex with Edwards at the Star Motel and at I Print 2 and described both locations. B.A. told Williams that she and Edwards went to the Star Motel at the beginning of October. Williams went to the Star Motel and requested receipts for October 2009. Williams found a receipt indicating Edwards rented a room at the Star Motel at 8:10 a.m. on October 8, 2009 for a party of two. Williams also went to I Print 2. In Williams's opinion, the description given by B.A. matched what he saw at I Print 2. Williams saw a sofa in an upstairs room at I Print 2, but did not perform any forensic testing on the sofa.

Because B.A. did not know the identity of the other two men who allegedly had sex with her at I Print 2, Williams did no further investigation of those allegations. Williams referred B.A. to the REACH clinic and acknowledged that B.A.'s records indicate she told the clinic that she had had sex with more than ten individuals over the age of eighteen. Williams did not have B.A.'s records from the clinic when he interviewed B.A., and she did not make an outcry about these other individuals.

Williams admitted that St. Anthony's records did not indicate that B.A. was tardy on October 8, 2009. However, the school told Williams that "sometimes it fluctuates" and B.A. could still receive credit for being in class even if she was late. B.A.'s attendance records were

admitted through Karen Hardy, the admissions director for St. Anthony's. Those records indicated B.A. was not marked absent or tardy on October 8, 2009. According to Hardy, it is important for a teacher to note whether a student is absent or tardy, but it does not always happen. Hardy agreed that compliance with the rule sometimes "get[s] a little thin when it comes to attendance and tardies." Hardy also testified that, in 2009, the Thanksgiving break began on Monday, November 23rd, and continued through the following Friday. B.A. would not have been attending school on November 23, 2009.

Sam Patel testified that he owned the Star Motel. When an individual wants to rent a room at the motel, they make a copy of the individual's identification and, if requested, give the individual a receipt. Patel confirmed that the October 8, 2009 receipt, with a copy of Edwards's identification on it, that was provided to Williams is a record from the Star Motel.

Clifton Smith testified he had been Edwards's best friend for approximately twenty years and owns I Print 2, a graphic design and printing company, with Edwards. Rutherford Barnett, who is in his 80s, was the only other employee of I Print 2 in October 2009. According to Smith, other individuals do not come to I Print 2 just to "hang out."

David Edwards testified that he is Edwards's brother and was currently in a drug treatment program. David indicated that, before he started the treatment program, he had a problem with crack cocaine for twenty years. He was homeless, and Edwards would often rent him a motel room so that he would have a place to stay. According to David, Edwards rented a room for him at the Star Motel in October 2009. David admitted that Edwards rented him rooms at other motels at different times, but recalled Edwards renting him a room at the Star Motel in October 2009 because it was just after his birthday and he needed to hide from a drug dealer.

Edwards testified at trial. Further, the written statement he gave to Williams was introduced into evidence and his interview with Williams was played for the trial court. In his

testimony and statements, Edwards said that in the fall of 2009, he worked with Smith and Barnett at I Print 2, a print shop. Barnett, who is in his 80s, is Edwards's great-uncle and started the business. Edwards became involved in the business when he was released from prison in 2005. Edwards had been convicted of the unauthorized use of a motor vehicle. He also had three convictions for writing a check without sufficient funds.

Edwards was married and had two children with his wife as well as three children from previous relationships. In the fall of 2009, four of his children lived with him and his wife. Two of Edwards's older children began attending St. Anthony's in the 2009 school year. Edwards's niece and nephew also attended St. Anthony's. Edwards thought St. Anthony's offered a curriculum through twelfth grade.

Edwards admitted he met B.A. at the Town East Mall during the summer before the 2009 school year. Edwards was paying his cellphone bill when one of his nephews asked for a piece of paper to write down a telephone number. He gave his nephew one of his business cards to use. The business card had his personal and business telephone numbers on it. When Edwards left the store, he saw his nephews talking to a group of young ladies. Edwards said hello to the group.

The business phone at I Print 2 began receiving calls from an "unknown caller." The person calling would not talk when Barnett answered the phone. One day around the Fourth of July, B.A. called his cellphone and told him that she was "S" and that he met her at the mall. B.A. told Edwards that she was going to call him "D." Edwards said he did not remember her. B.A. continued to call Edwards, and Edwards asked B.A. to describe herself. Edwards admitted that B.A. also sent him one picture, but testified that B.A. had clothes on in the picture. B.A. told Edwards that she was eighteen years old, and he told her that he was thirty-seven years old. According to Edwards, B.A. called him between 100 and 150 times and their longest

conversation was approximately five minutes in length. Edwards described B.A. as a "nuisance" and said he told her to stop calling him.

Edwards told Williams that at the "beginning of the school year," his nephew told him that B.A. was not eighteen. However, at trial, Edwards testified that his nephew did not know B.A.'s real name because Edwards thought her name was "S." Rather, his nephew said that "S" must be lying about being eighteen because eighteen-year-old students did not attend St. Anthony's.

In late August or early September, B.A. began making sexually explicit comments during their conversations. Sometime around November 2009, they began planning to meet. Edwards took his children to school every morning, and he and B.A. agreed to meet by the sno-cone store on the side of the school. Edwards told Williams that he met B.A. with the intention of having sex with her. However, at trial, Edwards testified he did not intend to have sex with B.A.; rather, he discussed with B.A. watching her and her half-sister have sex.

B.A. met Edwards by the sno-cone shop. According to Edwards, B.A. was wearing blue sweatpants and a sweatshirt or sweater. She was not wearing a school uniform. Edwards's youngest son was in the car. B.A. got in the car, and they drove toward Edwards's son's day care. On the way, Edwards stopped to get gas. After dropping his son off at the day care, Edwards bought B.A. some donuts. Edwards testified he then received a telephone call from a customer and went to I Print 2 to turn on the printing machine. Edwards told B.A. to stay in the car. However, B.A. came inside the building.

According to Edwards, B.A. went into all the downstairs rooms. He told B.A. not to go upstairs, but she ran up the stairs. Edwards followed her. B.A. began jumping on the couch in the lounge area. Edwards told B.A. she was acting like a child and asked whether she was really eighteen years old. B.A. said she was almost nineteen years old. B.A. then took off her sweater

and threw it across the room.  It hit something on the corner of a desk, and Edwards tried to grab the object.  As he did, B.A. pulled his arm and started trying to open the buttons on her shirt.  She said "give me some" or "don't you want this?"  He said no.  They went downstairs, and he took B.A. back to school.  Although B.A. continued to call him, Edwards installed an application on his phone to block anonymous calls and did not talk to B.A. again until the day before he was arrested.  During that last call, B.A. asked him if he was in trouble and said that she was sorry.  Edwards denied picking B.A. up at school more than once, denied taking B.A. to the Star Motel, and denied having sex with B.A.

Edwards was charged in two cases with aggravated sexual assault of a child.  During closing argument, the prosecutor requested that Edwards be found guilty of (1) one offense of aggravated sexual assault based on the incident at the Star Motel in October 2009 when B.A. was thirteen, and (2) the lesser included offense of sexual assault of a child based on an incident that occurred after B.A. turned fourteen on November 15, 2009.  The trial court found Edwards guilty of one offense of aggravated sexual assault and one offense of sexual assault, found the enhancement paragraph in each indictment to be true, and assessed punishment of fifteen years' imprisonment for each offense.

### Sufficiency of the Evidence

In his first issue, Edwards contends the evidence is insufficient to support either conviction.  We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013).  We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667.  This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the

evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The fact finder is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We defer to the fact finder's determinations of credibility, and may not substitute our judgment for that of the fact finder. *Jackson*, 443 U.S. at 319; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury").

As charged in this case, a person commits the offense of aggravated sexual assault by intentionally or knowingly causing the penetration of the sexual organ of a child younger than fourteen years of age by any means. TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(2)(B) (West Supp. 2013). A person commits the offense of sexual assault by intentionally or knowingly causing the penetration of the sexual organ of a child by any means. *Id.* § 22.011(a)(2)(A) (West 2011). For purposes of section 22.011, child is defined as "a person younger than 17 years of age." *Id.* § 22.011(c)(1). The testimony of the child victim alone is sufficient to support a conviction for aggravated sexual assault or sexual assault. TEX. CODE CRIM. PROC. ANN. art. 38.07(a), (b)(1) (West Supp. 2013); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978); *Lee v. State*, 186 S.W.3d 649, 655 (Tex. App.—Dallas 2006, pet. ref'd). Further, the testimony of the outcry witness is sufficient to support a conviction for aggravated sexual assault of a child. *Rodriguez v. State*, 819 S.W.2d 871, 873 (Tex. Crim. App. 1991); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.072 (West Supp. 2013) (testimony of outcry

witness that meets statutory criteria is not inadmissible as hearsay); *Martinez v. State*, 178 S.W.3d 806, 811 (Tex. Crim. App. 2005) (outcry witness may recite child's out-of-court statements concerning offense and testimony is substantive evidence of crime).

B.A. testified that, in October 2009 when she was thirteen years old, Edwards picked her up from St. Anthony's, took her to the Star Motel, and had vaginal sex with her. A receipt from the Star Motel showed that Edwards rented a room at 8:10 a.m. on October 8, 2009 for a party of two. B.A. also testified that after she turned fourteen on November 15, 2009, Edwards picked her up from St. Anthony's, took her to I Print 2 on two occasions, and had vaginal sex with her on both occasions. B.A. also testified that sometime in late December 2009 or early January 2010, Edwards came to her house and had vaginal sex with her. Polk, the outcry witness, testified that B.A. told her on January 20, 2010 that "D" had been picking her up from school and having sex with her. B.A. indicated this had happened more than one time and that she and "D" had sex at a motel and at his workplace. Edwards admitted that B.A. called him "D," he talked to B.A. on the telephone over one hundred times, that some of those conversations were sexually explicit, and that he picked B.A. up at school one time and took her to I Print 2 with the intention of having sex with her. He denied, however, that he actually had sex with B.A.

In his appellate brief, Edwards recognizes the testimony of a child victim is sufficient to support a conviction for aggravated sexual assault or sexual assault, but contends that B.A.'s testimony was not credible based on her age, her fixation on conceiving a child, and her use of drugs and alcohol beginning at age twelve that affected her memory. Edwards also points to evidence that he rented a room at the Star Motel for his brother in October 2009, B.A.'s records do not indicate that she was tardy or absent on October 8, 2009, and, contrary to B.A.'s testimony, he could not have picked her up at school on November 23, 2009 because no classes were being held over the Thanksgiving break. However, the trial court, as the fact finder, heard

all the evidence, including Edwards's attacks on B.A.'s credibility, and it was the trial court's role to resolve any conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. The trial court, as the fact finder, clearly found B.A. to be credible, and we must defer to the fact finder's determination of credibility. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899; *King*, 29 S.W.3d at 562. We conclude the evidence is sufficient to support the convictions for aggravated sexual assault and sexual assault. We resolve Edwards's first issue against him.

### Evidentiary Issues

In his second and third issues, Edwards asserts the trial court erred by admitting hearsay evidence offered for the truth of the matter asserted. We review the trial court's admission of evidence under an abuse of discretion standard. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion. *Id.*

Edwards first complains about Williams testifying, over Edwards's hearsay objection, about B.A.'s statements that the offenses occurred at the Star Motel and I Print 2. However, it is well-established that "erroneously admitting evidence 'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.'" *Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010) (quoting *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)); *see also Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (noting any error was harmless in light of "very similar" evidence admitted without objection). In other words, error in the admission of evidence may be rendered harmless when "substantially the same evidence" is admitted elsewhere without objection. *Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991). Even if Williams's testimony about

–13–

B.A.'s description of where the offenses occurred was hearsay, B.A. testified that Edwards had sex with her at both the Star Motel and at I Print 2. B.A. described, and identified pictures of, both locations. Because B.A. testified extensively about both the Star Motel and I Print 2, Williams's testimony regarding the same locations was harmless. We resolve Edwards's second issue against him.

In his third issue, Edwards complains the trial court erred by admitting the receipt from the Star Motel based on Williams's testimony that he obtained the receipt from the motel. After the State moved to admit the receipt, Edwards objected that the receipt was hearsay and Williams was not the custodian of records for the Star Motel. The trial court overruled the objection and admitted the receipt.

During his cross-examination of Williams, Edwards attempted to introduce copies of B.A.'s school attendance records that Williams had reviewed. The prosecutor objected to the records as hearsay. The trial court sustained the objection and then stated it was reconsidering its ruling on the admissibility of the receipt from the Star Motel. After the conclusion of Williams's testimony, the trial court stated that it believed Edwards's objection to the receipt was "proper unless there is a follow-up predicate."

The State then called Patel, who testified that he was the owner of the Star Motel and its custodian of records. Patel testified the receipt was from the Star Motel and was kept in the regular course of business. The receipt was then admitted again without an objection from Edwards. We conclude any error by the trial court in initially admitting the receipt through Williams's testimony was cured when the same evidence was admitted, without objection, through Patel. *See Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) ("'An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without

objection.'" (quoting *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)); *see also*

*Coble*, 330 S.W.3d at 282. We resolve Edwards's third issue against him.

### Modification of Judgments

In our case number 05-12-01687-CR (trial court number F10-51415-X), Edwards was convicted of sexual assault of a child under section 22.011 of the penal code. The judgment, however, reflects Edwards was convicted of aggravated sexual assault of a child under section 22.01 of the penal code. In our case number 05-12-01398-CR (trial court number F10-71377-X), Edwards was convicted of aggravated sexual assault of a child under section 22.021 of the penal code. The judgment, however, reflects that Edwards was convicted under "28.021 Penal Code." This Court has the power to modify an incorrect judgment to make the record speak the truth when we have the necessary information to do so. *See* TEX. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we modify the trial court's judgment in case number 05-12-01687-CR to reflect Edwards was convicted of sexual assault of a child under section 22.011 of the penal code and the trial court's judgment in case number 05-12-01398-CR to reflect that Edwards was convicted of aggravated sexual assault of a child under section 22.021 of the penal code.

As modified, we affirm the trial court's judgments.


Do Not Publish
TEX. R. APP. P. 47

121398F.U05

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

–15–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

DARIUS EDWARDS, Appellant

No. 05-12-01687-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 6, Dallas County, Texas, Trial Court Cause No. F10-51415-X. Opinion delivered by Justice Fillmore, Justices Evans and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

The section of the trial court's judgment entitled "Offense for which Defendant is Convicted" is modified to state "SEXUAL ASSAULT OF A CHILD."

The section of the trial court's judgment entitled "Statute for Offense" is modified to state "22.011 Penal Code."

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered June 9, 2014

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DARIUS EDWARDS, Appellant

No. 05-12-01398-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 6, Dallas County, Texas, Trial Court Cause No. F10-71377-X. Opinion delivered by Justice Fillmore, Justices Evans and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

The section of the trial court's judgment entitled "Statute for Offense" is modified to state "22.021 Penal Code."

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered June 9, 2014

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE